Mr. Rainey. Good morning, Your Honors, and may it please the Court, I'm Richard Rainey on behalf of Knowles, the appellant. We were here before this Court in May arguing about the claim term package and the impact of this Court's Memstech decision on the construction of that term by the Board, and we're back again. Will a decision in that one materially affect this one and vice versa? I think it depends on the decision. So our view is that to the extent, you know, we think Memstech was controlling that case and indeed the solicitor conceded it's controlling that case. We said it's controlling there, it's even more controlling here because we're talking about the same patent, the 231 patent, which was at issue in Memstech. We would submit the fundamental mistake made by the Board in that re-exam is essentially the same mistake made here, and that is ignoring the guidance of this Court, ignoring the intrinsic record, and ignoring the clear extrinsic record, which in fact the Board here, you know, recognized, set forth the most commonly understood meaning of the term package. It seems to us... So if that case issues first, will we be bound and vice versa? You know, you're going to say, well, it depends if I win or not. Again, it depends on the precise holding of the Court, but I do, I can conceive of a holding from that decision that would bind this Court, because in my view, if Memstech is controlling in that case, it's controlling here, necessarily. I mean, to me it's a stronger case, although in that case, you had Memstech on the face of the pack, and here we have it, you know, it's the same patent issue in the appeal. So if that's the situation, I think yes, Your Honor. So the situation we have here is equally compelling. We have extrinsic evidence that clearly points us to a package requiring a mounting mechanism. We would argue, in fact, two specific types of mounting mechanisms are the only two that we're known to be are, the only two described in the intrinsic record, but in any event, a device that doesn't have a mounting mechanism is not a package. When we are looking at extrinsic evidence to understand the meaning of a term in a patent, we're supposed to give deference to the lower tribunal's findings as to the meaning and value of that extrinsic evidence, right? Under the Tevitt decision, yes, that's correct. So I guess what I'm trying to figure out is, assuming that the intrinsic evidence doesn't clarify things, and so now we're just left with trying to figure out what is the meaning of electronic package, and then sources of extrinsic evidence are now submitted to the board, and they've got to sort it out, all this competing extrinsic evidence, and they make a finding that, based on the corpus of extrinsic evidence they're looking at, the term package to one of skill in this art isn't necessarily confined and restricted to having a second-level connection that uses either through-hole mounting or surface mounting on a PCB, then therefore they don't feel compelled to insert all of that language into the claim. Should we be giving deference to that, or is that still de novo? Well, so I think there's two responses. One, we have a Federal Circuit opinion that Two, we have intrinsic evidence that I think does show us there are two types of mounting mechanisms through-hole and surface mount. Those are the only two discussed in the spec, which is entirely consistent with all of the treatises. But three, we have a problem in the findings as well on extrinsic evidence, because the board acknowledged the two sources that it looked to, which I would argue don't crisply address the issue. They went up to an abstract point in those two treatises, which don't really address the question about the second-level connection directly. But the board found with both of those references that no second-level connection was even required. That can't be right in the context of this Court's decision in Menstech, which says, in the absence of a second-level connection, you've got no package. Well, the board at the same time said it wasn't reaching or making a finding that no second-level connection is required for this term package. It was just making an observation about that particular piece of extrinsic evidence. But ultimately, what it rested on was concluding that there was extrinsic evidence, authoritative dictionaries, technical dictionaries, that counseled against loading up the meaning of package to have all these very particularized types of connections. And so I guess in the end, putting aside your Menstech opinion, which I know we've got to get to, I'm not sure how we can up here all of a sudden say no, the board lacked any substantial evidence to read the extrinsic evidence the way it did. Let me try responding in two ways to that. One, the board did find, I think correctly so, that the other extrinsic evidence, which it brushed aside, represented the most commonly understood meaning for a package with the details that you're talking about. If our exercise under BRI is to come to a conclusion about what a claim means, recognizing what those of skill in the art understand the term means, it seems to me brushing aside the most commonly understood definition is itself an error. Second, the court did, I agree with you, the court didn't say we're going to ignore a second level package. It made up, we would argue, a construction, any electromechanical connection means, whatever that means. It never explains what that is. But the any electromechanical connection means, it's not a position anybody advocated. They just pulled it out of thin air out of two treatises which the board admitted, to their view at least, didn't require any second level connection at all. So how can looking at two sources, which the board says don't require any second level connection at all, pulling a kind of second level connection? Well, I mean, to be fair, the way the case was pitched to them was that all they had to resolve on claim construction was whether the word packaging, as that is used in the claim, necessarily requires that there be a second level connection using one of those two connection means to a PCB. And so then the board said, well, after we consult all of the extrinsic evidence under the broadest reasonable interpretation, we don't necessarily think the word packaging requires all of that. It could be any connection. You know, not these two particular connections that Knowles wants us to read into the claim. So I would argue, first of all, we very clearly argued that a mechanism of some type had to be there. And in fact, Halteran did not have any mechanism of any kind to mechanically hold the device in place. You're talking about a flexible substrate where you had contact as disclosed on one side and the microphone attached on the other side to kind of a flexible substrate. The best analogy I could come up with is it's kind of like a TV with a plug where if you hired an installer to mount your TV, flat panel TV on the wall to watch a football game, and you came home and all the installer had done is plugged it in, you would be very unhappy with the installer because there's no mounting there. We very clearly, and on the other hand, that a mounting mechanism of some kind has to be there. There is nothing in Halteran teaching a mounting mechanism there. So let's get to your claim construction again, right? Because, I mean, clearly there is a connection going on in Halteran with the contact pads. When you insert the end of that chip into some other device, the contact pads are making a connection. There might be an electrical connection there, but there's no mechanical connection. Right. And so that gets to your claim construction, that you need the claim construction to be understood to require not only an electrical connection, but also some type of mechanical bonding connection. And that is the terms of the debate on whether or not the extrinsic evidence requires an understanding of packaging to have all of that and the board found otherwise. But the extrinsic evidence that the board said reflected the most common understanding in term clearly shows when you're dividing the universe of packages into two families. They're both, they share a common characteristic. And the common characteristic is they have electrical connections and also mechanical support is provided to the device. Otherwise, and the other terms were frankly mentioned in the definition, talk about providing mechanical support for the circuits. And in the case of a MEMS microphone, which is what's at issue in this invention, they're very sensitive electronic devices. And what makes frankly producing a MEMS device with a microphone, and it's such a remarkable breakthrough was the ability in this case to have the package to protect that microphone both mechanically as well as providing electrical. Do you agree with Sirrus at least that Halterin has two levels of interconnection, one between the microphone and the flexible member and the other one between the flexible member and the external? No. No? We do not. In our view, Halterin is missing a second level of interconnection as we contend the term is understood by those who are still in the art. That's because it doesn't have this mechanical bonding connection. It lacks that or it's not, you know, it's not surface mounted, it's not... It's a fundamentally different structure. It has no mounting mechanism of any kind taught in the reference. And the board nowhere explains which it's obligated to do even so that where Halterin meets its, you know, its construction of any electromechanical needs. There's no explanation at all. The second issue I wanted to just briefly touch on is the issue of written description with respect to the solder reflow claims. We believe the board erred here in several respects. One, the board brushed aside the evidence of what a person still in the art would have understood, the state of the art at the time of the invention. This is a disclosure we think which very clearly satisfies this court's Ariadne case law that provides the blaze marks toward solder reflow in the following regard. This is very clearly a... These claims are directed to a surface mounted embodiment which is what the disclosed embodiment is with solder pads on the bottom in an array on the bottom of the package. The evidence we submitted which is not disputed by anybody makes it very clear that those who still in the art understood at the time of the invention that the primary method that one would use to attach a package like this would be solder reflow. This is not a situation where you have 15 or 20 or 50 different techniques and we just pick one out of thin air. This is the technique that those that still in the art would have used. So we submit the board erred here in its finding. In fact, Sirrus concedes that the pads would be capable of reflow and that's all that was required below under the claim construction exam that the board applied. Are you going to touch on your echelon argument at all? Happy to touch on that, Your Honor. The third issue we have here is that we believe that there's been a failure of proof. The record is devoid of evidence establishing that the two Sirrus entities are the proper parties. The echelon framed the question as does the third party have standing to properly bring the appeal? Well, so standing... How is it applicable here? So the issue here is the statute that we're relying on, and this is what the echelon court made clear, says that only the third party requester is a proper party both before the board and before this court. We actually already know one of the Sirrus entities is not a proper party. It's the parent company. So at least one of the two entities is conceded is not a proper party here. The other entity, when they appeared below, what they filed were papers to say we are the real party in interest, a different inquiry at the patent office. And in fact, they made a motion to participate in oral argument. That motion was not granted. And what the PTO said was you can show up at oral argument. If the panel wants to ask you a question or two, you can respond. And so that was the ruling. When they filed their notice of appeal, we immediately filed papers to have this case, have the record remanded so we could determine... Who filed the notice of appeal? I'm sorry, we filed the notice of appeal. You didn't file the notice of appeal. Yes. If I misspoke, I apologize. Okay. Yes, we filed the notice of appeal. They appeared, and we immediately moved to have the record remanded for findings because the record had contained no evidence. But the problem there is that your side, or I don't know, were you there, were you the lawyer below? I was not. Okay. Well, whoever the lawyer was below or the party itself never actually made a motion to say, wait a second, you put Cirrus on the caption of this inter-parties re-examination proceeding, and that is wrong. And I challenge this. I throw the gauntlet down. And so therefore, the board was never actually confronted with having to answer this question. And then only after the board issued a decision, and then only after the board issued a reconsideration decision, and then after you filed your notice of appeal, did you then file a motion not below, but to this court asking for something that you didn't actually ask below. And so I'm wondering whether now this is a waived situation in terms of whether you can now at this late juncture raise these types of arguments that were never actually put to the test below by presenting them to the board in the right vehicle. Yes, you did file an opposition to their desire to appear at the oral argument, but that opposition was confined to the question of whether or not Cirrus should be allowed to argue at the oral argument. It wasn't an actual formal challenge to whether they could be put on the caption. And as soon as they were put on the caption, your side remained silent for the whole way through. So respectfully, I believe we did properly object below. We were told we could not file any further papers on the issue, and in fact their request to participate was denied. The fact that they were put on the caption, in fact, they're on the caption here, it does not make it accurate or correct. This is an issue they bear the burden of establishing. This is not our burden. This is their burden to establish that this corporate change here still allows them to be the third party requester. Well, it was accepted by the board. I don't know that there was any analysis done by the board. But necessarily, the caption was changed. And so therefore, it was accepted. And then that is where now, if you're unhappy with that, that's where you need to step in and say, wait a second, what happened here? And so that's the problem that is missing in this case. And so I don't know why it's permissible to overturn the work of the board, both in its initial decision and its recon decision, when this particular matter wasn't raised in front of it. Your Honor, there is no evidence in this record that the board made any analysis when arriving at who was putting in the caption. The best I can surmise is that's a ministerial task that was done behind the scenes with reflecting no analysis whatsoever. So I don't think one can read anything into how the So I don't think that reflects a substantive determination by anybody that, in fact, and we know a serious parent is not a proper party here. Do you get to lie in wait, though, and wait till you get to the next tribunal to make the challenge? Well, I believe we raised the issue below. We're not permitted to file any further papers. I'm not sure what else. What do you mean you're not permitted to file any further papers? Did you object to that? I think we did object to that. I mean, what does it mean you weren't permitted to file any further papers? Maybe you weren't allowed to file any further papers on the question of whether cirrus could appear at the oral argument, but that's a separate question from whether you had a right to contest the change in party status. Judge, I respectfully believe we contested that at the first instance we could. Did you raise it at the oral argument before the board? They weren't permitted to participate in oral argument. I guess our view was by that time we had prevailed on the issue of whether they could participate, and it was left to the discretion of the board if they wanted to ask them some questions. So I guess to us it had been decided in our favor. What had been decided in your favor? That they could not participate in oral argument. That seems like a decision on the merits, if there is a decision on the merits, that they weren't the proper party in the case. Well, the problem was is that they filed their request to appear at the oral argument very, very late in an untimely way, and so the board concluded, well, this is not timely, so the best we'll do is let them sit there in case we have questions. I'm fascinated by lawyers believing that they're barred from filing anything and not having anything in the record, formally objecting to that debarment, and you have to show me something that says you did. The best argument I have on that, Your Honor, is I believe my client feels I could raise the objection below, and at the first instance here on appeal, we raised the objection. So that's the best answer I have to that. All right. Okay. Let's have this rebuttal, Mr. Rainey. Thank you. Good morning, Your Honor. It's David Speed on behalf of the appellees. I'm going to start in the same order that Noll's counsel went, but if there's any particular questions you'd like to ask. Well, let's just start with the same question I asked at the beginning, with respect to the other pending Noll's litigation. I think that the construction of package from the other case will be highly relevant here. I do agree with counsel for Noll's that there would be ways that you could imagine a holding would be presented that doesn't necessarily bind on both panels. The key case that they point to repeatedly in the briefing in today's argument back in May is the MEMS technology case. And I think what's important with the MEMS technology case is that we look at the fact that there was a specific construction breached by the MEMS technology panel. And that construction is that one ordinary spilling art would know that a package is a self-contained unit that has two levels of connection, to the device and to a circuit. If there's only one connection, there is no package. Nothing in that kind of construction refers to surface mounting or through-hole mounting. There's simply nothing there. So if anything, the MEMS decision actually supports the board's construction, which said, we need to have a second-level connection, but the manner in which you achieve that second-level connection is open. I would completely agree with you if that's all the MEMS tech opinion said, but it did say something else in a different section of the opinion. And that's the part that Noll's is really leaning on. The fact that at some point in the opinion, the opinion said something about a mountable package. Correct. Earlier in the opinion, when discussing whether or not the preamble is all about the preamble, whether or not the preamble... So then what is the meaning and vitality of that aspect of the opinion that actually says, evokes the notion of a mountable package? Respectfully, I would suggest that the reference to mountable earlier in the opinion does not trump the explicit reference or the explicit plate construction position that the court adopted. If mountable earlier in the opinion, the author of the opinion clearly wrote mountable and then clearly affirmed the ITC's claim construction, if they understood mountable to have some significance, such as requiring through-hole mounting or surface mounting, which is the position that Noll's had took throughout the proceeding before the board, then they wouldn't have been able to affirm the ITC's construction because essentially it would be overly broad. They would have to do something different to that construction. They didn't do anything of that nature. What's also important here to recognize is that in the MEMSAC decision, the adopted construction was Noll's construction. That's the construction that they advocated, the party and their expert advocated that construction before the ITC because they thought it distinguished this Baumhauer reference. Now we're in this pre-examination proceeding and we have a new reference, the Halter reference. So Noll's essentially went to wipe the board clean and started over and have a more narrow construction so that they can avoid the Halter reference. Before they were satisfied with the construction, it only required a second-level connection, but not a specific type of second-level connection. We submit it should be, or at least the board has substantial evidence to have found that the term does not require the specific mounting techniques that Noll suggested below. And turning to the question of whether Halter actually has a mountable technique in some fashion, I've heard the hypothetical of if you football on TV, you ask them to mount it. Respectfully, I think the hypothetical is slightly off base. We're talking about a device that's 15 millimeters in length, so it's not a long cord as might have been conveyed with the hand gestures. And what happens with Halter is the external device has a kinect here. So it would be the equivalent of if you had a hole with a wall that had a hole in it that perfectly fit the TV. The TV is mountable in that wall and gets connected in behind it. That would be the type of mountable system that Halter is disclosing. Another way to look at it is through-hole mounting itself has pins, and those pins go into holes on the PCB board. So it's the same essential idea that you have a printed circuit board that's receiving with its holes the package. Nothing mechanical. Is any of this necessary to your argument and to affirming the board's decision? No, it's not. This is more necessary just to respond. You're just having fun now. I'm not. Not yet. Turning to, if I can, to the written description issue. I think context here for these claims is really important. The claims 23 through 27 were added to the patent late in the reexamination process. And as originally recited, they had a package with a substrate, and there were solder pads in the bottom of the substrate. Full stop. That was it. The examiner did not reject that claim for lack of written description. It rejected it for being anticipated under 102 by Halter and several other references. Knowles, in its next response, then amended the language to narrow it, such that those solder pads on the bottom of the substrate were configured for solder reflow. So by making that amendment, and we must presume that all claim terms have meaning, Knowles effectively is saying to the examiner and to the public, there are two flavors of substrate. Those that are configured for solder reflow, and those that are not configured for solder reflow. Do you read Ariad as not allowing consideration of a gazeta's knowledge of the art at the time of filing? I don't read Ariad as excluding any knowledge of OZA at that time. Assuming that the specification, Ariad is clearly, must look to the four corners of the specification. If the specification provides some hook for the opponent's knowledge to become relevant, that would be applicable. Here, however, it's recognized and conceded that solder pads on the bottom, that's the blaze mark, that there's solder pads in the bottom, that at best, counsel said it's principally done with solder reflow. But that means that there are other ways to do it. And so the disclosure of solder pads configured for solder reflow, and it's not an inherent disclosure of solder pads configured for solder reflow. If it was, then there would have been no need for them to amend the claim language in the first place, because they've already had a claim to solder pads on the bottom of the substrate. Rather than stay with that language, which again, there was written description for that broad genus, they went and tried to claim this very narrow species. Yet there's no description in the patent that the inventor at the time of filing, and let's keep in mind this patent was filed years ago, and it's now late in the re-examination process, in the middle of litigations, that they're now trying to claim this very specific invention of a solder pad that's configured for solder reflow. And frankly, the patent says nothing about what makes a solder pad on the bottom of the substrate configured for solder reflow, versus one that's not configured for solder reflow. And because there's no description of how you figure out the two flavors, there's certainly no disclosure that at the time of filing, the inventor actually possessed that more narrow invention. Turning to the Agilent questions that were addressed at the end of the argument, it's clear, in our opinion, that Wilson Electronics filed this re-examination seven years ago. During the course of the re-examination, there's a corporate acquisition by SiriusLogic bought Wilson, and changed Wilson's name to SiriusLogic International UK Ltd. We submitted a notice to the board informing of that. We submitted a supplemental notice giving more details. At no point did the board say, we need evidence, we need to see the merger agreement, we need to see some type of documents. They took that information, and while they denied our right to participate at the hearing because it was untimely, they still allowed us to attend and answer any questions that they may have had about the third-party request for status. They had no questions. Then in the order, the initial order from the board, the board found us to be the third-party requesters, and as the panel was highlighting during the earlier questions, there was no objection at that point from Knowles in their re-hearing decision seeking to somehow argue that we shouldn't participate in the appeal or in the process. Were you under the impression they were barred from doing that? I certainly do not believe that they would have been barred from any point prior. One key factual element to keep in mind here is that this acquisition occurred after the record was largely closed. The briefing to the board for re-hearing was done. The only activities that we have taken on behalf of SeriousLogic and SeriousLogic International have been to participate at the oral argument and participate in the sense that we showed up and were asked a few questions on the merits, and then participate in the re-hearing decision, and then this briefing here with this court. At all other times, Wolfson Electronics was the third-party requester. They were there the whole time, so they're essentially seeking a redo to send this back to inject further delay into this re-examination, which has been pending for years, so that they can run out the clock on the length of the patent. When does this patent expire? I actually don't know. I'm probably blanking, but I believe 2022 would be when it expires, so it's 2017. Every year that they can get, get them closer to that date, so that the re-exam would essentially be rendered annullity for them. Unless the panel has any questions, I think I've addressed the main points that I'd like to address. Any more questions? No questions? Okay, thank you. Thank you, Mr. Steele. I imagine we're having five minutes of fun. I'm good, thank you. Just a few quick comments. On the Memstech decision, I believe counsel said it's, your view is it supports the construction below. That is not the holding of the board. The board twice in its decision in honorary hearing viewed this court's Memstech decision as narrower than its construction. The second point I would make is, Judge Chen, you talked about the mountable package part. That is, that's actually in the claim construction section where the court says the requirement that the components listed in the claim body come together to form a mountable package is thus an important characteristic of the claim you mentioned. And we agree, a mountable package is critically important. Again, that was in the context of trying to figure out whether the preamble breathed life and meaning into the claim such that it should be considered an actual limitation to be given patentable weight. That's correct. But then there was, I guess, a couple pages later, that's where we get into the heart of where, you know, this court said, you know, we understand this term package to mean a self-contained unit with two levels of connection. One connection to the device, one connection to some outside circuit parentheses system, closed parentheses. That's correct. And then period. So right there is talking about a connection to some external unit. If it didn't say a connection that is a mountable connection to that external unit. So my only comment here is one has to take all this in the context of what was being disputed at the time. In that particular case, they said there was no connection at all to the outside world with the particular prior art reference. That was the invalidity section of the opinion. But this is a problem we see here, taking words in these definitions out of context. This still is a package for a microelectronics device. We've tried to lay the groundwork of what a person of ordinary skill power would understand these packages to mean. And to take away from the package the mounting mechanism, which is consistent across all of these, you know, it eliminates one of the fundamental characteristics of what these have. It provides the support for these devices. That's absolutely critical in terms of how these function. So I would argue, again, we have to be careful about taking phrases and words in isolation without understanding the overall context of what a package is in this particular field of art. Just one last comment on the written description. Let me ask you this. Is it your position that solder reflow is the only realistic possibility or the only possibility? I believe, as a practical matter, it's the only possibility. So maybe realistic and practical, I guess, doesn't matter. And the reason, I'm just going to get to this issue of blaze marks. I think Council said the only blaze mark is solder pads at the bottom. That's not accurate. That's not what we say. There's a number of blaze marks in this. That's a very prominent one. But this was a background invention. The inventor makes very clear, I'm trying, in fact, he says, the through-hole approaches that have been used in the past, the DIP and the SOIC, are not as desirable because I'm looking to make one that can be manufactured. And in the manufacturing process, when you're talking about an array of solder pads, you're going to use surface mount. So at most, we're talking about two or three. We mentioned wave soldering and hand soldering, but those would not be used in a manufacturing process for a MEMS microphone. Is there an expert declaration or anything like that, saying everything that you're saying? There is tons of extrinsic evidence that we cited that the board just blew through because the board said, I'm not going to look at it. I'm sorry. Was there an expert declaration or anything like that? Standing here right now, I can't answer that question. Yeah, I'm wondering if, for instance, hand soldering includes a robot doing it. I don't know the answer to that question. Okay. Board has no further questions? No, I think we've exhausted it. Thank you. Thank you both. The case is taken under submission.